May it please the court. The three issues that we raise on appeal to this panel address two sets of trial court rulings. First, rulings with respect to the design evidence that the plaintiffs presented as the basis for their design defect case. And second, rulings with respect to the design defect case. The trial court rulings concerning evidence that Federal Signal proffered of widespread and common use and awareness by ordinary firefighters of risks of hearing loss on the job and use of hearing protection. And I plan to address both those issues in that order. First, as to the sirens and the design offered by Mr. Gettys. There is no dispute in this case that sirens are essential safety devices. That sirens protect the public and that sirens protect firefighters also. There is also no dispute that to promote the effectiveness of sirens as warning devices, the State of Illinois, the Chicago Fire Department, specifically, and fire departments generally, regulate sirens in two regards. At least two regards. First, loudness. Both of these, by the way, both of these factors go to the effectiveness of sirens as warning. The first regulations and requirements concern loudness levels. Not only straight ahead, but 50 degrees each direction off-axis. And the second set of requirements and regulations concern the frequency or pitch. And the Chicago Fire Department and others require low frequency because low frequency sound does a better job at warning, getting around objects, penetrating objects, than high frequency sound. And there's no debate about these regulations or these factors. And I will come back to them. There's also no debate, no dispute in the record, that federal signal sirens always complied with these regulatory and fire department requirements. Now, moving to the plaintiff's claim, the design defect claim in this case. The plaintiff's claim that federal signal sirens, while meeting the loudness requirements, both straight ahead and off-axis, and the frequency requirements, are effective. But the design defect claim that these requirements send too much sound to the back, the back of the siren where firefighters sit on vehicles. Sound to the back is a byproduct of sound to the front. And in fact, that feature of sound, that is even though I'm speaking to your honors, people in the back of the court can still hear me, is what makes sound in many cases a more effective warning than light. And fire departments in Chicago and Illinois and elsewhere have decided to use both light and sound. But it's important to recognize that one of the benefits of sound as a warning device is that it does go in all directions. It does go around things and it does penetrate things like vehicle windows and car vehicles so that passengers and drivers can hear. Now, the plaintiff's design claim was that federal signal should have and could have designed a siren that would have it both ways. That's the way they described it in the court. And by both ways, they meant it would meet these requirements of loudness and frequency, but would reduce the sound going backwards to the firefighters. And they said they would present a design that had it both ways. And their sole support for that design was expert witness Mr. Geddes, who testified on direct examination for a grand total of 21 pages in the 1600-page transcript, much of that his education and background. Mr. Geddes offered what he called a hypothetical design. And he used a math model that he said would predict performance of this hypothetical design. And he used a math model that he said would predict performance of this hypothetical siren design when it was actually, if it was ever in use. And his model, his own model, showed how this hypothetical siren design would perform. And here's what the evidence shows. And as we've submitted, the hypothetical siren design Mr. Geddes offered would not be loud enough to meet the Chicago Fire Department requirements for loudness on the off-access side. It would be loud enough straight ahead, but it would not meet the 50 degrees off-access requirements. And was that established on cross-examination? Yes, Your Honor. On cross-examination at page 863 of our appendix, Mr. Geddes said he admitted it probably would not meet those requirements. And federal signals expert Mr. Bader, who's designed and worked with sirens for over 20 years, testified that it would not meet those requirements. And there was no cross-examination or no refutation of that in the record. Let's talk, if we could for a moment. Yes, sir. Sorry for the interruption, but let's talk for a moment about Illinois law in terms of proving the feasible alternative design. Would you accept for the moment that plaintiffs under Michelagic and other cases do not have the burden of, you know, establishing that? I would agree that there is not a hard-set rule that in every case an alternative design must be shown. Okay. But in your brief you suggest that in this case the plaintiffs recognized that the only way that they could prevail in the case is to prove that, and that in your judgment they failed to do that. Is that accurate? Yes. Okay. So then can you cite for us any authority that would suggest that when the plaintiff gets up and opening a statement and says they can have them loud, really loud, but they have to make them in a way that protects the firefighters and our guy is going to come in here and do that, does that change their burden of proof? Well, I don't know that it changes their burden of proof, or at least I can't cite a case to the Court right now that says that. I do think, though, that the Jablonski case by the Supreme Court, in which the Court actually applied the risk-utility factors, is instructive on that. That's the recent case. And Jablonski involves a product, I submit, with less utility, while a very important issue, the gas tank safety, and that's an important category of vehicle accidents, less utility than Sirens. Sirens have the highest utility possible. They're actually necessary, not just useful. And that case had an expert who did so much more than what we saw here. That expert actually tested alternative designs, alternative locations of the gas tank. He mocked up potential shields. And the Supreme Court found, reviewing the jury verdict for the plaintiffs in that case, reviewing the JNOV denial of the trial court and the appellate affirmance of the trial court, the Supreme Court applied the risk-utility doctrine in that case and found that the plaintiffs could not sustain it as an issue. It was a matter of law. Because of a failure of proof. Yes, and the alternative design, while a technical possibility, was not feasible. Now, we have here a necessary product, and the plaintiffs base their case of design defect on the expert, Mr. Geddes, who says he has this way to do it both, a hypothetical design that would do it both ways. But his own model showed, as I mentioned, it wouldn't meet the off-access requirements. It also showed, and he admitted this on cross-examination, and Mr. Bader confirmed it, that his sounds were at the higher frequency levels. Above 2,000 hertz. Chicago Fire Department says it has to be below 2,000 for a really good reason. The low frequency sound is a better warning. Now, higher frequency sound is not as good a warning, but it is easier to direct. And so what Mr. Geddes' hypothetical model was doing was using out-of-range frequencies in order to better direct them. The consequence, though, is he has a model of something that would not qualify as a siren in Chicago, probably anywhere in Illinois, because it's not loud enough at these off-access locations, and it's at the wrong frequencies. Then, Mr. Bader established, and again, there's no refutation of this in the record, Mr. Geddes' model shows that it wouldn't do a better job of directing sound away from the back than federal signals. He testified it would be a 10 to 35 decibel reduction going back, but that was as compared to what's going forward. He never testified that it would do a better job than federal signal. In his 21 pages of direct, he never identified a single federal signal siren. When did this litigation start in the U.S.? The actual cases were filed, I think, first in 1999 or 2000. This trial was the second trial in 2009. There was a trial in 2001 of 27 plaintiffs that's in the record. Now, in that period of time, from 1999 to 2012, has there been introduced on the market a siren that would do what the plaintiff's expert claims should have been, should be done? Not to our knowledge, and there is no suggestion in the record that any such siren is on the market. Now, Mr. Geddes' opinions, we believe, compel judgment for federal signal on two grounds. I'm sorry, let me mention one other attribute of the hypothetical siren that Mr. Geddes offered. He showed a drawing, a first-cut drawing of what a siren like this would look like, and it would look like a megaphone, sort of like a cheerleader's megaphone. And there's no dispute in the record on this point, either, that if you used that kind of siren on an emergency vehicle in Chicago, it would last about a few minutes because of all the elements Chicago fire vehicles, emergency vehicles face, the snow, the dirt, and it would come right in onto the compressor drive and the other features of the siren that cause it to work. So that's another reason why this wasn't even a hypothetical, this wasn't even a feasible concept. At the end of his testimony, Mr. Geddes, what we're kind of left with is Mr. Geddes testified that while this design didn't have it both ways, in fact, this design had it neither way. It didn't meet the requirements of a siren, and it didn't reduce the noise backwards better than federal signal. So even though this design wouldn't meet it both ways, he had pretty good confidence in the future he could design it. And that is the sum and substance of the design testimony of Mr. Geddes. And if the court is interested in actually looking at all of it, it starts at record 1669. And we've looked at it. Yes, sir. So for two reasons, that compels judgment for federal signal. First, under the Jablonski case, as I mentioned, and again, that was a jury verdict. That gives us the clearest application of the risk utility in light of the long line of cases before it, Mikulajic, Callas, and the other cases. And I want to focus on one aspect of Jablonski that I think is particularly important here, and that is the court there highlighted the factor of whether alternative designs, in that case of a gas tank, location, shielding, would introduce other risks of equal or greater magnitude. And it found that it did. And moving the gas tank has consequences. Well, we have a situation where Mr. Geddes' hypothetical design would introduce enormous risks of equal or greater magnitude. We would have sirens that didn't meet the requirements for effective warning devices for the public, to protect the public, and to protect firefighters. So we think the risk utility analysis here is even stronger for federal signal than it was for Ford Motor Company in the Jablonski case. And again, when we're left with an expression of confidence that in the future, an expert could design a safe alternative, boy, if that's the standard, if that were to qualify as sufficient to support a verdict of design defect, that is the plaintiff brings in an expert who's willing to say, I'm confident in the future I could design a better product, a safer product than that one. Boy, there's not many products that are going to be able to pass that test. The second reason that Mr. Geddes' speculative opinions compel judgment for federal signal is they should have been excluded in the first place. And we make this argument in our briefs. Holpe and the other cases we cite show that this kind of inadmissible speculation by an expert, when he actually doesn't have any kind of, has not taken the steps down the road to a feasible design, and, in fact, the steps he's taken show it is not a feasible design. His own math model shows that. We submit that that is an abuse of discretion of the gatekeeper's role. And in a case like this, where the design defect turns on that expert, the unreasonably dangerous condition of this product, Mr. Geddes was the one who gave that opinion and that evidence. Without that, the plaintiff's case fails. And we cite cases for that, including the Henry case of 2009. So with respect to Mr. Geddes and the design defect, we make two arguments as to why federal signal should obtain judgment as a matter of law. Unless the Court has other questions, I was going to move to the warning evidence. Okay, before you get to that, why don't you? What about the non-delegable duty of the manufacturer under Jablonski and a whole string of cases? Yes, Your Honor, they mention that. And the non-delegable duty under a long line of Illinois cases refers to machines, products like press operators, press machines, other machines where a safety guard can be installed or should be installed on the machine. And the rationale for that and those opinions is, manufacturer controls the machine and devices that are installed on it. And in the Rios case, as the Court said, we don't leave a critical phase of the manufacturing process to the haphazard conduct of the ultimate user. Once the device is attached to the machine, whatever unreasonably dangerous condition has been corrected. So my point is, those cases involve devices to the machine. Okay. So the manufacturer here, Federal Signal, first of all, the city's contract, they didn't care who actually manufactured the trucks. That was subject to bid, I suppose. But every contract was required to buy its signals only from Federal Signal. Is that a fair statement? I'm sorry. It was in the bid specifications from the city. I believe that is correct. The bid specifications were actually for the vehicles, and they specified the siren requirements. That the siren had to be bought from Federal Signal. I don't know that. I don't know that it specified Federal Signal. I'm pretty sure that's in the contract. It may well be. I just can't say yes or no with confidence on that. They also, the city's contract also required that the signals meet certain standards, including the SAE J1849 standards. Yes. Which were first promulgated in 1989, long before these sirens presumably were made. These sirens were made, for the most part, probably before 1989. Before 1989. Yes. Some may have been after, but the When were the trucks bought? I don't know that that's in the record. But these firefighters were on the job in the 80s and 90s, I believe the record shows. Well, the record that's included that we saw includes the SAE J1849 standard that was first issued in 1989. Perhaps your colleague can point me to an earlier date. But in that specific standard that is required of the signal, required of Federal Signal by the contract with the city, the standard itself refers to a recommendation for the hearing in the passenger compartment. It does. And it's very important because that standard, what that standard says 85 decibels. Yes. And it says that the hearing level in the cab should be tested and monitored by the vehicle manufacturer and the users, that is, the fire department. And the reason is because the sound level in the cab, regardless of the sound level of the sirens, the sound level in the cab depends on a whole variety of circumstances. The kind of soundproofing in the cab and the sound exposure, the noise exposure to the firefighters depends on time. How many runs, how long the runs are, things like that that the fire departments know and information that varies from fire department to fire department, vehicle to vehicle. And that's why the SAE J1849 standard specifically says the sound levels in the cab should be evaluated by vehicle manufacturers and users. But part of SAE J1849 includes SAE J336, which is the sound criteria for the cab interior. And it's my understanding that because of that rollover in 1849 that that became part of the specifications. Well, I don't doubt that the Court is right. And there is confirming, there's a confirmation, and that is there is an NFPA 1500 standard that applies to fire departments, and it refers to a sound level, I think, of 90 in the cab, not to exceed 90. That was the basis of the Chicago. And what was the noise level in the cabs in this case? Well, the Chicago Fire Department did a test. They did a test. They did a test with the EIDL, the Illinois Department of Labor. Federal Signal wasn't involved in that at all. They showed that there were levels above 90 at times. There were even very maximum levels of 109, although we don't know that that was siren noise. They also showed on average they were in the low 80 range. The Fire Department decided, given that low average, which happens to be below OSHA's 8-hour-a-day average, the Fire Department decided, again, without input from Federal Signal at all, that it would not issue hearing protection. But there's no doubt that there were levels that the Fire Department was aware of that exceeded 85 or 90 degrees in those cabs of those vehicles they tested back in the early 2000 timeframe. I don't have the date. The IDOL test. I'm sorry? The IDOL test. Yes, the IDOL test. But I guess my point on the non-delegable duty is adding a feature to a machine, modifying the machine, is different than a user taking ordinary care and using the product. And we made this point in the brief. Jackhammer manufacturers don't make jackhammers that are safe for people who don't wear shoes. Jackhammer barefoot. And, you know, this ties in with the evidence we proffered, but the jury didn't hear, about the widespread and common use, recommendation, and awareness of hearing protection as a simple step that firefighters can take and do take in other fire departments. And the court in this case excluded that evidence. And the evidence I. . . That's a good segue. Keep going. Okay. And that evidence included survey evidence that we had, that 44 out of 45 fire departments in the Chicago area use hearing protection. It included the union grievance I mentioned, which shows that the firefighters essentially saying, Chicago Fire Department, follow industry standard. It included training manuals. And these training manuals go way back in time. And training manuals that show hearing protection is one of the ten recommended pieces of protection, protective gear, that firefighters should use. The trial court in this case, unlike in Track 1, excluded all that evidence. And the court's rationale again and again, what other fire departments, what other firefighters do, isn't relevant. Only if you can show that these firefighters use hearing protection, these firefighters wear these materials, can you get this evidence in. The problem with that and the error in that is that the risk utility test requires what ordinary firefighters do. Objective versus subjective. Yes, sir. And the court, so the court misapplied that. Now, the court instructed the jury properly that it was an objective test, but the court then prevented us from putting in the evidence. And that prejudice was severe. It was severe for a second reason. And that is in the opening statement, through the testimony of several plaintiff firefighters, and again in closing, the plaintiffs took the position that hearing protection, great idea in theory, doesn't work, not practical. We wanted to show the jury the evidence that it does work and that it is practical is found in the widespread common use by other fire departments and other firefighters, and we weren't permitted to do that. And so we think that error was severely prejudicial. It's an abuse of discretion. We think the proper review is a de novo standard because it was a misapplication of law. But under either standard, we think that error would compel a new trial as an alternative. I know I've run over and thus the court has questions. I hope to have a couple minutes on rebuttal. We'll give you five minutes coming back. Thank you. This is a strict liability case involving defectively designed fire sirens, and the evidence shows that even when carefully used as intended by professional firefighters, Federal Signal sirens cause serious and permanent harm in the form of hearing loss to the firefighters. And Federal Signal's own expert, Joe Bader, conceded that the firefighters will be subjected to harmful rearward noise emissions which won't exceed the daily dose. And as counsel has stated, there is no dispute that the jury was properly instructed on the relevant factors under the two tests that can be used to determine whether or not a product is unreasonably dangerous, the consumer expectation test and the risk utility test. And the jury found, of course, for the firefighters, and the evidence supports their finding, and certainly Federal Signal has not shown that the jury's verdict was against the manifest weight of the evidence, which is the standard that must be applied. Now, it must be emphasized that the firefighters established many factors under the risk utility test to show that these products were unreasonably dangerous. First of all, they clearly established that these sirens cause injury. Second, and perhaps much more important, they demonstrated the great magnitude of that injury. We're talking about a permanent, irreversible loss of a hearing function. The siren in question complied with the standards promulgated by the State, by the Fire Department, and by the Society of Automotive Engineers. Is that correct? We don't dispute that they complied with this. So my question then, in light of that, would you have a better case if the siren did not comply? Obviously we would. Why do you have a good case if it did? But what is important to note also is that there is no standard that requires or even addresses the real-world noise admission. The standards, which are developed by the industry itself primarily, and Mr. Bader was on the committee that had jurisdiction to deal with it, only focused on the warning capacity, the forward and side sound. And there was no standard that ever addressed when it becomes excessive rearward. The other point that we've established is that this hearing loss occurs even when professional firefighters properly use those sirens in the intended manner. In short, basically if you are using these sirens, you are going to be subjected to a harmful rearward noise. Now under the established law, the jury was entitled to give whatever weight it gave to any of these factors which we established. And it had concluded, as I noted, that these products were unreasonably dangerous. That would have been enough just to address the factors that I've mentioned. We, under the Mikulogic case, which we affirmed this principle, we were not required to demonstrate that there was a feasible alternative design that would be safer. But we did. Okay. You took on that burden. Would you agree with me in terms of what was said in the opening statement and what was attempted to be put on in the form of Dr. Gettys? I wouldn't characterize it as taking on the burden because the case law doesn't require us to prove it. If we tried and the jury did not believe us on that issue, it could give whatever weight it chose to that issue, that factor, and to the other factors and still find that the products were unreasonably dangerous. And we did present expert evidence from Dr. Earl Gettys, which was based on fundamental principles of physics and acoustics, which showed that a feasible design could have been utilized that would have created sirens that could still satisfy their warning function and yet have significantly reduced rearward emissions and which would meet all the industry standards. Now, there's a dispute over that, and the witness for Federal Signal, who happens to be the guy who's defending his life's work in creating sirens and who never tested at all to address the question of how those sirens affect firefighters with rearward emissions, he disputes it. But that's a question of credibility. The jury is free to decide which witness is more credible. And what Dr. Gettys was applying were basic principles of physics and acoustics. And under the principles of the scientific method, he concedes, and he's rightfully cautious in saying until we've actually tested this, built it and tested it, there may be needs to modify it, to address, to tweak. That's what happened. That's why I gave the analogy. Is he going to get around to it any time soon? What? Is it going to be tested? Is there going to be a prototype? Is somebody else going to manufacture a siren that does what he claims could be done? Well, that's the point. Only a company like Federal Signal, which has never bothered to do so, has either the financial resources or the testing equipment. The Anna Ann Eckerich Chamber needed to do that. And it's significant that they've never really focused on that at all. Let me ask you, your opponent in the brief, and I don't know that we necessarily got to it that much this morning in oral argument, but Federal Signal is suggesting that this court adopt, as a matter of public policy, a requirement in a case involving a product that is designed and used specifically for public safety, that if that product meets all of the requirements imposed on it by state law and other regulations, that in the absence of a feasible alternative design, that as a matter of law, that product should not be unreasonably, could not be held to be unreasonably dangerous. What's your response to that? Well, first of all, I mean, as you recognize, basically they're asking to change the law, something that was reaffirmed in the Mickelogic case, that there is no obligation. As devil's advocate here for the moment, what they're suggesting is that the reason why there should be a special exception to that law is that the product that we're dealing with here is something that's designed for public safety, public safety of pedestrians, public safety of motorists, public safety of the firefighters in case somebody hits them, and also public safety of the people that they're going to try to protect at the scene of whatever they're being called to. Well, first of all, we don't deny that there's an important public safety function in sirens. And what we do deny is that the law should be changed to give a special protection under the law at the expense of the firefighters who must operate with these sirens and deny the firefighters their right of legal recourse when this happens. We could have argued that there's a tremendous public safety function being served by firefighters who daily risk their lives doing their job, but we're not asking for special provisions to benefit people who do this sort of work. We're just saying the law should be applied without change fairly to both. And there's a fundamental false dichotomy in the argument that you're summarizing. First of all, you know, federal signals position is that sirens have to be loud, and gosh, they just can't be made safer for firefighters. And therefore, you know, we need special protections. Well, first of all, Dr. Giddes refuted that argument, and Julian is free to accept his position. Secondly, even if their position were true, that, gee, you just can't make a safe fire siren, that does not require changing the law that prohibits and, you know, and puts strict liability on a manufacturer who introduces into the market a product that is clearly unreasonably dangerous and causes serious harm. Federal signal, quite frankly, you know, its position is we can't make it safer, but maybe the use of hearing protection could assist in the problem. That's a non-delegable duty. But federal signal could have, quite frankly, gone to the city and says, we've got a problem here. We know that the product can cause serious harm to firefighters. We're not going to sell this product to you unless you, the city, agree either to indemnify us if our products cause injury or, since we believe that hearing devices might be of some assistance, unless you contractually agree to provide the firefighters with such protection. Or they could have gone on the market and sought insurance, or they could have gone to the state legislature and said, look, here's this problem, this dilemma we have. We need some protection so that we can put on the market a product that causes great harm. What is totally improper is the attempt to create a special immunization for federal signal and its admittedly dangerous product that goes on the back of the firefighters and denies them the right when they do their job properly and tells them you are not going to have legal recourse for your injury when you lose hearing when you did the job just the way you were supposed to. You know, you've referred to your clients here as professional firefighters, and we all obviously greatly admire our professional firefighters. Let's talk about a different profession. Let's say baggage handlers who are out there by the planes at O'Hare and Midway and getting the bags off in the presence of these very loud jet engines. Do you think that that would be a good class action or a good group of people to sue the manufacturers of jet engines because they're too loud for them when they're doing their job? Well, first of all, there's going to be a question that's not an issue here, which is an assumption of risk. I mean, there's no evidence that the firefighters ever expected that when they were told to do the job the way they did their job that it was going to cause injury. Do you ever see any of them without the de-intensifiers on when they're out there in the presence of these very loud jet engines? I believe that you're dealing with both communication issues and questions of protection, but it's a different situation. I mean, if, again, in those cases you have the employer requiring and issuing safety protection, and most likely, I mean, again, if that weren't provided, I think a manufacturer would be very much at risk if it says you can go out, we know that the product is going to be used in a way that causes serious injury without getting assurances. Wouldn't affirming this jury verdict on all counts, you know, in all respects, the unreasonably dangerous aspect and the admission of the hearing protection, wouldn't that basically just tell firefighters it's okay to just go out there and never use any hearing protection, continue doing your job without it, and if you wind up with some hearing loss you have a deep pocket to sue? I don't think anyone would trade their hearing for the potential of financial gain. Of course they wouldn't. Of course they wouldn't. But if they're not doing, as professionals, if the professional firefighters are not doing what is ordinarily expected in terms of, you know, personal responsibility and using some hearing protection, isn't that something that the jury ought to hear on the basis of the risk utility analysis, not on the assumption of risk? I mean, every firefighter in this case was examined at depositions, and everyone testified they had no knowledge that the way the sirens operated was going to cause them injury. With all due respect, you're talking about the subject of analysis under assumption of risk, which, you know, we're putting off to the side. What I'm talking about is what was customary for firefighters to do and what information was out there suggesting that it should be done on an objective basis under the risk utility analysis. It seems to me that in a case where you've got a manufacturer that makes a product that complies with standards and you have firefighters who are not using protection, you know, that they ought to be able to get that into evidence on the objective, not the subjective, because, of course, they all testified, as you mentioned, that they were unaware of the risk. Well, objectively, I don't understand why that would not be a good idea. Well, because you're basically shifting a non-delegable duty. I mean, if, you know, you're basically saying that firefighters who are subjective don't have any understanding that they're going to be suffering hearing loss. Nonetheless, the city, which is the one that issues the equipment and tells firefighters what they do, should have taken upon itself the burden of making those sirens safe. And as I indicated, again, the dichotomy is false here. Federal signal, when it knows that without hearing protection, its sirens are going to cause a problem, and it is not trying to correct the problem by creating a feasible alternative design that we believe could have been done, had at least the obligation to undertake the responsibility of assuring that when its sirens are being used, it will be used in a safe way by having the city assume the responsibility of either providing that protection or making some guarantees of indemnification. But basically, federal signal has released into the market a product that, when used as intended, causes a serious permanent injury. And that clearly, under the risk and utility test, gives the jury grounds to find that the product is unreasonably dangerous. What did the jury do? There was evidence that was put in about some of the hearing protection, so there was some limited evidence. Could you summarize for us what, if any, evidence the jury did hear about hearing protection? I believe that was not the principal part of their case. There was some anticipation of arguments that might be made about that, and when the judge excluded the evidence, I think he excluded it correctly because it was not relevant to the actual defenses in the case. It was an attempt to shift, essentially, this non-valuable duty to the city, which purchases the sirens, or to the firefighters themselves, which have to use them. It would lead to great confusion on the issue we just talked about, which is the assumption of risk. If you had evidence about matters of which the firefighters had no knowledge, they, of course, had never seen this training manual. There was no evidence that they were aware of the union grievance, and there was also no evidence that, within the relevant time period, that the firefighters were aware that other fire departments utilized safety protection devices for the purposes of reducing noise emissions, as opposed to, perhaps, for communications reasons at O'Hare. So I think, again, that the evidence, the judge has an abusive discretion standard here in terms of deciding whether or not the potential prejudice of allowing evidence that would confuse the jury and lead them to shifting the blame to the firefighters and to the city, which is not a defendant in the case, was properly excluded, or whether it would lead to confusing the jury as to whether or not the firefighters knew and, therefore, assumed the risk of the potential of hearing loss. So basically, again, our position is that we were not required to show the alternative design, but we did. And we have a lot of quibbles here from somebody who was a self-interested witness, who was defending his life's work, and the jury was entitled to reject that. And the judge properly looked at Dr. Geddes' expert credentials, found him an industry expert. He has practical experience, he has academic experience, he has patents. He's talking about what can be done. And, of course, I think we gave the analogy of the Manhattan Project. You know, only when you've got the resources to actually finally build and test the product can you know whether or not any further modifications are needed. We have a very, you know, we have a false dichotomy here. I mean, just because this is an important product for public safety doesn't mean that the law should be changed to put that burden on firefighters and deny them, in practical terms, any recourse. When they do their job as intended and nonetheless are subjected to significant hearing loss from the rearward admissions that are coming from the sirens. And under both tests, I think we've established that certainly the manifest weight of evidence standard entitles that jury defining to be upheld. You heard me earlier asking your colleague about SAE J1849. I'm sorry. You heard me earlier talking about the standard, the SAE standard J1849, and the fact that it has a requirement for forward and 50-degree sound, but it doesn't have a requirement for in-cab sound, but it does have a recommendation. Do you believe that that recommendation and all of the other language in Appendix A, which includes references to NIOSH and says the manufacturer has to make sure that the sirens are installed in the proper place, the manufacturer has to make sure that a guide should specify how to install the siren, should provide warnings concerning potential for hearing damage, do you believe that that raises that recommendation for the 85 decibels to a requirement or that it could just be freely ignored or that nobody had to pay any attention to it, that somehow it just disappeared? What happens to that recommendation? Well, that's the problem. None of these standards and recommendations deal with anything other than how you properly install the sirens and how they're supposed to work in their warning function. Well, no, this particular recommendation says specifically the in-cab decibel level should be no more than 85, but it is a recommendation. It is not a requirement, and I'm trying to figure out whether or not, because it's in the same Appendix A and it's in the NIOSH recommendations as well, that somehow we can extrapolate from that that Federal Signal was aware of this as a recommendation, even though it's not called a requirement, and that they're held to that standard anyhow. Why would they be held to the standard of a recommendation as opposed to a requirement? Well, to that extent, it does add to the rest utility test by showing that, you know, not only was there no standard that mandated that type of rearward noise, but there were significant reasons why it shouldn't, why it was understood by everybody who was involved in the manufacturing and purchasing process that it shouldn't have that rearward noise. It wasn't, unfortunately, a mandated standard, but certainly I think that might be actually something that adds to the risk utility factor test. Is it enough under the risk utility that the manufacturer knew that there was a recommendation of this nature when it was building its sirens and just ignored it or didn't design around it or didn't accommodate it somehow? Well, I think certainly it, you know, it's not enough, you know, what factors are under the risk utility test? I mean, it's broad, it's open-ended. I mean, significantly after McElogic,  any factors that have to be considered, of course, no single factor has to be considered. I think the jury can consider all of these things in determining whether or not the product is unreasonably dangerous. But part of the balance has to be whether or not the design used did not conform to design standards and industry or guidelines provided. So do you consider this recommendation, not requirement, but recommendation in 1849 to be a design standard and an industry-recognized standard maker? I think it makes Federal Signals' position far weaker if it knew the recommendations and persistently never did any testing in the cabs or in its own equipment to determine the effects of rearward emissions. Well, the recommendation is part of Appendix A, which is part of the contract for the sirens that are installed on the fire trucks. But if they didn't meet it and they didn't test it, I think that's a factor that certainly will go, you know, would further weigh in favor of the jury's finding. And as we note, under the cases, the jury can give whatever weight it wants to any of the factors and to every factor, but it doesn't have to be that all the factors do not have to be supported to be able to prove that the product was defectively designed and unreasonably dangerous. Was that the subject of either testimony in the form of expert testimony or argument by either side, this recommendation, about the decibel level within the cab? I don't recall. I really don't, Your Honor. It's in the record. It's part of the record that that document is part of the record because it was introduced into evidence. With the SAE standard, right? The SAE standard. All right. Okay. All right. Anything further? Do we have any other questions? No. Your colleague brought you a note if you want to look at that for a second. Did you see that? I'm sorry. That's okay. No big? Okay. All right. I just want to give you the opportunity in case if there's something you want to address. I don't have a problem. Well, I guess my point that was being made was that, you know, in terms of the type of hearing protection you need, you have to have something that would work and enable communication between firefighters. Essentially, the basic event is something that can only be provided by the city. And if the city chooses not to do so, that, you know, gets to the issue that was not permitted in this case, which is part of Federal Signal's argument, which is to shift the blame to the city, that it should have taken on the responsibility of dealing with the problem. Sole proximate cause. Right. Right. Okay. Okay. Thank you very much. Thank you. Briefly, I'm rebuttal, Your Honors. I'd like to first address the SAEJ 1849 standard that Your Honors have asked about. The manufacturer that recommendation is referring to, I believe, Your Honor, if you're referring to the SAEJ 1849 standards, referring to the vehicle manufacturer, because Federal Signal is manufacturing a component of the vehicle. And what SAEJ 1849 makes clear is, and this is adopted by the CFD, that sound level testing in the cab is to be done by vehicle manufacturers and the users. That's because there are some cabs designed by vehicles that can keep the sound level below 85. And what about SAEJ 336, which is the sound in the cab interior? Isn't that the siren manufacturer standard? I don't believe so, Your Honor. I don't have that standard in front of me. And there was never any argument or testimony at trial that somehow that put Federal Signal responsible. It would not be possible for Federal Signal to know what the sound levels are in cabs, because they vary so much depending on the configuration and the type of vehicle cab. Just like it's not possible for Federal Signal to know how long the exposure is or at what levels of firefighters, because those depend on fire department specifically. How long has Federal Signal been making sirens for fire engines? Many, many years. And in all those years, knowing that fire engines would be driven and used by firemen, fire personnel, firewomen, that Federal Signal in all those years didn't say, I've got it. Is there a new and better signal that doesn't hurt the people who are riding inside the cab? We actually did, Your Honor. We were the first ones to design the bumper siren, the BP-100. And before, sirens always used to be above the cab. We put it in the bumper. We designed a siren. In fact, it was the subject of this case. And it fits in the bumper. That makes a huge difference. That's not a lot of distance. It puts between the firefighter and the sound metal deflection. And there was testimony that made a 15-degree difference on average in the cab. So we did act there, and we were the first ones to do that. But there was ñ I heard a lot of argument about proper use and as intended the sirens will cause hearing protection. That was not proven at all. And, in fact, it depends. One of the plaintiffs, Doherty, this is in the record, his hearing, according to an audiogram, before he ever heard a siren on the job, was identical to his hearing after 11 years on the job. And so it is not clear at all that all firefighters will suffer hearing loss. But what is clear is that firefighters are ñ there are recommendations to use hearing protection, and firefighters commonly use it, and we weren't able to put that in. And so when the plaintiffs argued, used as intended, carefully used, we weren't able to counter that at all with that evidence. I'd also like to briefly address the question about whether we're advocating a new law. And we're not. And to the extent our brief suggested that, it should have been written more clearly. But we didn't intend to suggest a new provision of law. What we're suggesting is application of Mikulogic. Mikulogic says that not in all cases is a feasible alternative design required. But our argument is this is one of the cases where it should be. But regardless of that issue, I'd just set that issue aside. When you have a design defect on the shoulders of expert testimony that we have here, whatever the standard is, that does not meet the standard. And so we say that in this case, Illinois law is not satisfied for the reasons that I mentioned. And I appreciate the Court's indulgence, unless there's more questions. Okay. Thank both parties for excellent briefs and argument. And we'll get back to you just as soon as we can. The matter is taken under advisement, and we are adjourned.